**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PRINCIPAL LIFE INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 08-488-MPT |
| | : | |
| LAWRENCE RUCKER 2007 INSURANCE TRUST, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

David P. Primack, Esq., Drinker Biddle & Reath LLP, Wilmington, DE.
*Of Counsel:*  Jason P. Gosselin, Esq., and Thomas Downie, Esq., Drinker Biddle & Reath LLP, Philadelphia, PA.
Attorneys for Plaintiff Principal Life Insurance Company.

John E. James, Esq., David E. Moore, Esq., and Michael B. Rush, Esq., Potter Anderson & Corroon LLP, Wilmington, DE.
*Of Counsel:*  John E. Failla, Esq., Elise A. Yablonski, Esq., and Nathan Lander, Esq., Poskauer Rose LLP, New York, NY.
Attorneys for Defendant Lawrence Rucker 2007 Insurance Trust.

Wilmington, DE
August 30, 2010

Thynge, U.S. Magistrate Judge

## I. INTRODUCTION

On August 8, 2005, plaintiff Principal Life Insurance Company ("Principal") instituted this action seeking a declaratory judgment against Christiana Bank and Trust Company ("Christiana Bank"), as trustee for the Lawrence Rucker 2007 Insurance Trust ("Insurance Trust").[1] On September 17, 2008, the parties entered a stipulation substituting Insurance Trust as defendant in lieu of Christiana Bank.[2] Principal subsequently amended its complaint twice.[3] Principal claims that the life insurance policy ("Policy") issued on the life of Lawrence Rucker ("Rucker") is void or voidable because of a lack of an insurable interest and/or material misrepresentations.[4] On June 4, 2009, Insurance Trust answered the Second Amended Complaint.[5] Insurance Trust argues that: (1) Principal waived rescission through ratification of the Policy; (2) an insurable interest existed at the Policy's inception; and (3) any material misrepresentations were either known to Principal or made by its agents.[6] Presently before the court are the parties' cross-motions for summary judgment.[7] For the reasons that follow, the court denies Insurance Trust's motion and grants Principal's motion on the issue of insurable interest only.

---

[1] D.I. 1 at 1.

[2] D.I. 8.

[3] D.I. 9; D.I. 44. The Second Amended Complaint was filed on April 24, 2009.

[4] D.I. 44 at 1.

[5] D.I. 57. Principal answered the counterclaims and raised affirmative defenses to the counterclaims on December 31, 2009. *See* D.I. 97.

[6] D.I. 57 at 5-8.

[7] D.I. 116; D.I. 118.

## II.     BACKGROUND

This is a federal diversity action applying Delaware law.  Principal is a life insurance company with its principal place of business in Des Moines, Iowa.[8]  Insurance Trust is a statutory trust pursuant to 12 Del. C. § 3801.[9]  Principal alleges that the Policy was obtained illegally through a stranger originated life insurance ("STOLI") scheme.[10]  Such schemes are frequently used to gamble on the lives of strangers and profit from their deaths.[11]  Principal argues that a multi-layer trust arrangement was used to circumvent insurable interest requirements.[12]

Rucker began the process of obtaining life insurance through interactions with Wayne Aery ("Aery").[13]  Aery worked in conjunction with Brad Friedman ("Friedman"), a purported agent of Principal.[14]  Aery and Friedman also do business under the brokerage firm Lextor Financial.[15]  Aery assisted Rucker in completing the application ("Application") for life insurance.[16]

Prior to executing the Application, multiple trusts were created.  On or about August 14, 2007, the Lawrence Rucker 2007 Family Trust ("Family Trust") was

---

[8] D.I. 44 at 1.
[9] *Id.*; D.I. 57 at 1.
[10] D.I. 117 at 2.
[11] *Id.*
[12] *Id.* at 2-3.
[13] *Id.* at 7; D.I. 133 at 2.
[14] D.I. 117 at 7; D.I. 133 at 3.
[15] D.I. 117 at 7 (stating that both did business under Lextor Financial and/or Lextor Insurance Services); D.I. 117, Gosselin Aff., Ex. D at 15-16 (Aery admitting that Lextor Financial is Friedman's corporation and that he is an independent contractor of Lextor).
[16] D.I. 117 at 8; D.I. 133 at 3.

established.[17]  The Family Trust Agreement lists Rucker as settlor, Christiana Bank as

trustee, and Rucker as beneficiary.[18]  Additionally, on or about August 15, 2007, the

Insurance Trust was established.[19]  The Insurance Trust Agreement lists Rucker as

settlor, Christiana Bank as trustee, and the Family Trust as beneficiary.[20]  The GIII

Accumulation Trust ("GIII Trust") was also formed.[21]

   The Application was executed on August 16, 2007.[22]  It required a number of

disclosures, two of which are particularly relevant.  Question 6(a) asked whether the

applicant had an intention that "any group of investors will obtain any right, title, or

interest in any policy issued of the life of the Proposed Insured(s) . . . ."  Question 6(b)

asked whether the applicant would "borrow money to pay the premiums for this policy or

have someone else pay these premiums . . . in return for an assignment of policy values

back to them . . . ."  Both questions were answered in the negative.  The validity of

these answers is disputed.[23]

   In addition to the Application, Rucker also submitted a Confidential Financial

Statement ("CFS").[24]  The CFS represented Rucker's yearly income at $425,000 and his

---

[17] D.I. 117, Gosselin Aff., Ex. G at 14.

[18] *Id.* at 1.

[19] D.I. 117, Gosselin Aff., Ex. B at 16.

[20] *Id.* at 1.

[21] D.I. 121, Strother Aff., Ex. 9.

[22] D.I. 117, Halder Decl., Ex. T.

[23] *Compare* D.I. 117 at 24 (stating Principal's belief that the answer to Question 6(a) is false because Rucker always intended to sell the Policy) *and id.* at 25 (noting Principal's belief that answer to Question 6(b) is false because Rucker did not, and could not, pay premiums) *with* D.I. 133 at 22 (indicating Insurance Trust's belief that answer to Question 6(a) is true because Insurance Trust is still owner of Policy) *and id.* at 21 (explaining Insurance Trust's belief that answer to Question 6(b) is true because Rucker never assigned Policy in exchange for premiums).

[24] D.I. 117, Halder Decl., Ex. U.

net worth at $4.85 million.[25]  Rucker's actual income was approximately $120,000, and

his net worth significantly less than represented.[26]  Though the origin of this false

information is unclear, the parties agree it is invalid and not directly attributable to

Rucker.[27]

On September 26, 2007, Principal issued a Flexible Premium Universal Life

Insurance Policy in the amount of $3.5 million.[28]  The Policy named Insurance Trust as

the beneficiary.[29]  All premiums currently due have been paid and all other conditions of

the Policy have been performed.

Shortly after issuance of the Policy, a purchase agreement for the beneficial

interest in the Insurance Trust was executed between the Family Trust and the GIII

Trust.[30]  As a result of this agreement, the GIII Trust became "the sole holder of an

exclusive, undivided 100% beneficial interest" in the assets of the Insurance Trust.

Although the Insurance Trust remains the named beneficiary of the Policy, the GIII Trust

is the actual beneficiary and will receive all Policy proceeds according to this

agreement.

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court is to enter summary

judgment only when the record demonstrates that there is no genuine issue as to any

---

[25] *Id.*

[26] D.I. 117 at 9; D.I. 133 at 4.  *See also* D.I. 117, Gosselin Aff., Ex. E; D.I. 117, Gosselin Aff., Ex. F.

[27] D.I. 117 at 10 (noting that Rucker was not aware of false information in the CFS); D.I. 133 at 17 (stating that information in the CFS was not provided by Rucker).

[28] D.I. 117, Halder Decl., Ex. V.

[29] *Id.*

[30] D.I. 117, Gosselin Aff., Ex. L.

material fact and that the movant is entitled to judgment as a matter of law.  In deciding

a motion for summary judgment, a court's role is not to weigh the evidence or to

determine the truth of the matters asserted, but to determine whether there is a genuine

issue of fact for trial.[31]  In so doing, the court must view all facts and draw all reasonable

inferences in favor of the non-movant, take as true all allegations of the non-movant that

conflict with those of the movant, and resolve all doubts against the movant.[32]  The court

also must treat direct and circumstantial evidence alike.[33]

This standard does not change merely because there are cross-motions for

summary judgment.[34]  Cross-motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary
> judgment, and the making of such inherently contradictory claims does not
> constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and
> determination whether genuine issues of material fact exist.[35]

Moreover, "[t]he filing of cross-motions for summary judgment does not require the court

to grant summary judgment for either party."[36]

## IV.    DISCUSSION

### A.    Declaratory Judgment and Waiver of Rescission

It is well settled that declaratory judgment is a proper means for determining the

---

[31] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[32] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).
[33] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003).
[34] *Appleman's v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).
[35] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).
[36] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

validity of insurance contracts and the rights and obligations of parties thereto.[37]

Principal seeks a declaratory judgment under 28 U.S.C. § 2201 to determine whether

the Policy is void or voidable.[38]  Principal has kept the Policy in force pending this

court's determination as to its validity.[39]

Insurance Trust argues that Principal waived its right to rescind the Policy by

continuing to accept premiums after becoming aware of the alleged STOLI scheme.[40]  It

maintains that waiver occurs when a party learns of a basis for rescission and

subsequently takes inconsistent action.[41]

Insurance Trust's analysis of rescission, however, is inapplicable here.  Rather

than unilaterally rescind, Principal has provided notice to Insurance Trust that it believes

the contract to be void and has maintained the status quo vis-à-vis the Policy for the

duration of this case.[42]  Insurance Trust confuses the instant action for declaratory

judgment with an action for rescission.  While relief in either case may involve declaring

the Policy void, the nature of the two proceedings are separate and distinct.  As Rule 57

of the Federal Rules of Civil Procedure states, "[t]he existence of another adequate

---

[37] *See generally Household Intern., Inc. v. Westchester Fire Ins. Co.*, 286 F. Supp. 2d 369, 376 (D. Del. 2003) (noting declaratory judgment is available for an insurer to determine its rights and obligations under a policy).

[38] D.I. 44 at 1.

[39] *See Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 674 F. Supp. 2d 562, 568 (D. Del. 2009) (an action for declaratory judgment is an attempt to carry out contractual obligations).

[40] D.I. 133 at 25.

[41] *Id.* (citing *Am. Cas. Co. of Reading, Pa. v. Ford*, 187 A.2d 425, 428 (Del. Ch. 1963)).

[42] As previously stated, an action for declaratory judgment is "an attempt to carry . . . out" contractual obligations.  *Principal Life Ins. Co.,* 674 F. Supp. 2d at 568 (no anticipatory repudiation when seeking declaratory judgment and asking for the court's assistance).

remedy does not preclude a declaratory judgment that is otherwise appropriate." Because declaratory judgment is appropriate, Principal's ability to unilaterally rescind is not at issue.[43]

### B.    Count I (Insurable Interest)

Under Delaware law, one may not procure an insurance policy on the life of another without an insurable interest in that person's life.[44]  An insurable interest is vested in:  (1) individuals related closely by blood or by law with a substantial interest in the insured engendered by love or affection; (2) other individuals with a lawful and substantial economic interest in having the life of the insured individual continue; or (3) the trustee of a trust established by the insured.[45]  Insureds may also name their own trust as the beneficiary of a policy.  A valid insurance policy, however, requires an insurable interest at inception.[46]

In *Grisby v. Russell*, the Supreme Court recognized a distinction between life insurance policies and wagering contracts.[47]  A life insurance policy is "an agreement between an insurance company and a policyholder [with an insurable interest in the life of the insured] to pay a specified amount to a designated beneficiary on the insured's

---

[43] The court need not determine whether rescission is an adequate remedy.  Nor need it decide whether an agreement existed regarding premium retention.  *See generally* D.I. 132 at 19; D.I. 132, Supp. Gosselin Aff., Ex. AA (showing emails revealing intent to enter into written agreement).

[44] 18 Del. C. § 2704(a).  Lack of insurable interest is an issue that arises only at the time of policy procurement.  *Id.*

[45] 18 Del. C. § 2704(c) (quotations omitted).  The statute lists other forms of insurable interests that do not apply to this case.  *Id.*

[46] *Grisby v. Russell*, 222 U.S. 149, 156-67 (1911).

[47] *Id.* at 154-55.  A STOLI policy is a type of wagering contract.

death."[48]   A wagering contract is "an insurance policy issued to a person who is shown

to have no insurable interest in the person or property covered by the policy."[49]   A

wagering contract thus gives the policyholder a "sinister counter interest in having the

life come to an end."[50]   The *Grisby* Court explained that an insurance policy lacking an

insurable interest at inception serves as a cover for a wagering contract, contradicting

the purpose of life insurance.[51]   The insurable interest requirement, therefore, "curtail[s]

the use of insurance contracts as wagering contracts by distinguishing between

contracts that [seek] to dampen the risk of actual future loss, and those that instead

[seek] to speculate on whether some future contingency would occur."[52]   The insurable

interest requirement and the prohibition on wagering contracts have existed in accord

with *Grisby* for nearly a century.[53]

An individual has an insurable interest in his own life and may legally procure an

insurance policy for himself.[54]   Provided it is not a cover for a wagering contract, a

person may also insure his life in good faith for the benefit of another regardless of

---

[48] *See* BLACK'S LAW DICTIONARY 822 (8th ed. 2004) (defining life insurance), *and* 18 Del. C. § 2704(a) (requiring existence of an insurable interest for procurement of a life insurance policy).

[49] BLACK'S LAW DICTIONARY 822 (8th ed. 2004).

[50] *Grisby*, 222 U.S. at 154.  Logically, if the insured dies before total premium payments reach the policy's pre-negotiated value, the "investor" gains.  For example, if an individual obtains a fifty thousand dollar life insurance policy in the life of another, and only pays forty thousand dollars in premiums before the insured's death, the individual gains ten thousand dollars.

[51] *Id.* at 154-55.

[52] *Sun Life Assurance Co. of Canada v. Paulson*, Civ. No. 07-3877, 2008 WL 451054, at *2 n.4 (D. Minn. Feb. 15, 2008) (citation omitted).

[53] *Id.* (differentiating life insurance policies from wagering contracts and discussing present legal ramifications of both).

[54] *Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust*, 2010 WL 2898315, at *6 (D. Del. July 20, 2010).

whether that beneficiary has an insurable interest.[55]  Such a policy may also be

transferred at a later date to any entity irrespective of the existence of an insurable

interest.[56]  A life insurance policy procured at the behest of another, however, may lack

an insurable interest.[57]

The District of Delaware has recently addressed these insurable interest

requirements.[58]  Among other sources, this court looked to the District of Minnesota

case of *Sun Life Assurance Co. of Canada v. Paulson.*[59]  The *Paulson* court explained

that a life insurance policy is void as against public policy if the policy was "procured

under a scheme, purpose or agreement to transfer or assign the policy to a person

without an insurable interest in order to evade the law against wagering contracts."[60]

Therefore, where an insurance company can establish a "scheme, purpose or

agreement to transfer or assign a life insurance policy" to subvert "the law against

---

[55] *Lincoln Nat'l*, 2010 WL 2898315 at *7 (citing 44 AM. JUR. 2D *Insurance* § 978 (2010)).

[56] *Sun Life*, 2010 WL 2607247 at *4.

[57] *Id.* (interpreting Delaware's insurable interest statute).  Delaware's insurable interest statute reads:

Any individual of competent legal capacity may procure or effect an insurance contract upon his/her own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his/her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.

18 Del. C. § 2704(a).

[58] *See infra* note 69.

[59] See *Sun Life*, 2010 WL 2898315 at *4-*5 (indicating that the majority of cases involving STOLI schemes follow the *Paulson* analysis and require a plaintiff to introduce an identifiable third party to determine bilateral intent); *Lincoln Nat'l*, 2010 WL 2898315 at *9 (relying on *Paulson* in insurable interest analysis).

[60] *Sun Life*, 2008 WL 451054 at *2 (citing 44 C.J.S. *Insurance* § 353 (2007)).

wagering contracts," that policy is void *ab initio.*

The Policy in this case lacked an insurable interest at inception because it failed to satisfy section (a) of Delaware's insurable interest statute.[61]  Principal asserts, and Insurance Trust does not dispute, that Rucker always intended to sell the beneficial interest in the Policy (with Aery's help) for $105,000.[62]  Insurance Trust nonetheless contends that an agreement to sell the Policy could not have existed at inception because Rucker did not know the identity of the buyer at that time.[63]  Yet Insurance Trust admits that Aery intended to transfer the Policy from the beginning.[64]  Moreover, Rucker's and Aery's depositions make clear that the two had a *pre-negotiated* agreement to transfer the beneficial interest in the Policy, but for which Rucker would not have applied.[65]  Regardless of whether Rucker knew the identity of the future purchaser, he clearly intended to sell the beneficial interest in the Policy at the time it

---

[61] 18 Del. C. § 2704(a) (stating "no person shall procure or cause to be procured an insurance contract upon the life of another individual unless the benefits under such contract are payable . . . to a person having, at the time the contract was made, an insurable interest in the individual insured.").

[62] D.I. 117, Gosslin Aff., Ex. A at 56 ("[Aery] told me that it was $105,000 I would get because they were going to sell the policy"); *id.* at 59 ("It was–I bought it on the basis that [Aery] said, 'We're going to sell it in three weeks' or something.").  *See also* D.I. 117, Gosslin Aff., Ex. D at 174 ("I knew that we were selling–[Rucker] had every intention of selling the policy and it was a solid deal.").

[63] *See* D.I. 141 at 4-5 (arguing that Rucker did not know that GIII Trust would later procure Policy, and therefore could not have reached an agreement to sell Policy before procurement).

[64] D.I. 141 at 4-5.

[65] *See* D.I. 117, Gosslin Aff., Ex. D at 174 (Aery testifying to an understanding with Rucker to sell the Policy); D.I. 117, Gosslin Aff., Ex. A at 59 (Rucker testifying that "[t]here was no–nothing said about my keeping [the Policy].  I couldn't afford it, I mean there's no question about it, and that was that.").

was procured.[66]

Insurance Trust also argues that a legal interest in the Policy was never actually sold because the Insurance Trust is and always has been the Policy's beneficiary.[67] Insurance Trust further suggests that public policy concerns are absent here because the GIII Trust only purchased the beneficial interest in the Insurance Trust, and not the Policy itself.[68]  The court disagrees.  The public policy concerns discussed above cannot be avoided by transferring the Policy under the guise of a trust.  Here, the beneficial interest in the Policy was in fact transferred via the Insurance Trust–a trust established solely to evade the law against wagering contracts.  For purpose of this case, then, an interest in the Policy and an interest in the Insurance Trust are one and the same.[69]

As stated above, Rucker procured the Policy because of an agreement to later sell the beneficial interest for $105,000.  The actual sale of all interest in the Policy to the GIII Trust soon after it was procured corroborates the existence of such an agreement.[70]  The evidence submitted leaves no genuine issue of material fact that Rucker procured the Policy for later sale to a third party.  As the *Paulson* court stated, where an insurance company can show the existence of a "scheme, purpose or

---

[66] *See* D.I. 117, Gosslin Aff., Ex. D at 174 (Aery testifying that Rucker always intended to sell the Policy); D.I. 117, Gosslin Aff., Ex. A at 56 (Rucker stating that he only obtained the Policy because Aery told him he could sell it for $105,000).

[67] *See* D.I. 141 at 5.

[68] *Id.*

[69] *See generally Lincoln Nat'l*, 2010 WL 2898315 at *6 (discussing public policy concerns as applied to Delaware law); *Sun Life*, 2010 WL 2607247 at *4 (discussing *Grisby* and finding wagering contracts against public policy).

[70] *See* D.I. 117, Gosslin Aff., Ex. L (invoicing the sale of Rucker's life insurance policy to the GIII Trust for purchase price of $105,000 roughly one month after the life insurance policy was procured).

agreement to transfer or assign a life insurance policy" to subvert "the law against wagering contracts," that policy is void *ab initio*.[71]  These facts, viewed in the light most favorable to Insurance Trust, clearly demonstrate a "scheme or plan" to evade the law against wagering contracts.  The Policy therefore lacked an insurable interest at inception, and is void as contrary to public policy and Delaware's insurable interest statute.  Summary judgment is granted to Principal concerning Count I of the Second Amended Complaint.

### C.      Count II (Material Misrepresentations)

Under Delaware law, misrepresentations in life insurance applications can void a policy if:

> (1) Fraudulent; or (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or (3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.[72]

Principal maintains that the Policy is void because of material misrepresentations in the Policy Application and the CFS.[73]  Insurance Trust counters that these alleged misrepresentations are insufficient to void the Policy because:  (1) the CFS was not

---

[71] *See supra* note 60 and accompanying text (discussing the *Paulson* court's analysis).

[72] 18 Del. C. § 2711.

[73] D.I. 117 at 23.  Principal argues that material misrepresentations were made in the CFS concerning Rucker's financial information.  *Id.*  Also, Principal notes that additional misrepresentations were made in the Application concerning:  (1) the purpose of the Policy; (2) the intent for obtaining the Policy; and (3) the source of premium payments.  *Id.*

attached to the Policy; (2) any misrepresentations in the CFS came from Principal's own

agent; and (3) the purported misrepresentations in the Application are accurate.[74]

    1.    *Applicability of the CFS*

Representations in life insurance applications are only pertinent if attached to or

endorsed by the policy.  Delaware law provides that:

> [T]he policy and the application therefor, if a copy of such application is
> *endorsed upon or attached to the policy* when issued, shall constitute the
> entire contract between the parties and that all statements contained in
> the application shall, in the absence of fraud, be deemed representations
> and not warranties.[75]

Delaware law also states that a life insurance application is not admissible evidence

"unless a true copy of the application was *attached to or otherwise made a part of* the

policy or contract when issued."[76]  This court has previously determined that

misrepresentations contained in an application that is not attached to the corresponding

policy cannot be relied upon to vitiate that policy.[77]

The Policy here includes the following language:  "[t]his policy, the attached

application(s) and riders, any amendments to the application(s), any adjustment and

reinstatement application(s), and the current Data Pages make up the entire contract."[78]

It additionally states that "[n]o statement, unless made in an application(s), or

---

[74] D.I. 119 at 14.

[75] 18 Del. C. § 2907 (emphasis added).

[76] 18 Del. C. § 2710(a) (emphasis added).

[77] *Brasure v. Optimum Choice Ins. Co.*, 37 F.Supp. 2d 340, 344 (D. Del. 1999) (citing *Economy Fire & Casualty Co. v. Thornsberry*, 383 N.E.2d 780 (Ill. App. Ct. 1978)).  Further, even if the Application is not attached, a party may use judicial admissions as evidence of misrepresentation.  *Id.* at 345.  Here, it is arguable that misrepresentations in the CFS are judicially admitted.

[78] D.I. 117, Halder Decl., Ex. V at 17.

amendments thereto, will be used to void Your policy."[79]  While the parties agree that the CFS was not *physically* attached to the Policy,[80]  they disagree as to whether it was otherwise made a part of the Policy.

As previously noted, the CFS was requested and submitted after the Application was received.  The facts clearly indicate that both parties intended the CFS to be part of the Application.  First, the CFS is clearly marked "Application Supplement."[81]  Second, both Rucker and Friedman purportedly signed below the phrase that the CFS "statements . . . are part of my insurance application."[82]  Although not physically attached, the CFS was endorsed and otherwise made part of the Policy.

While 18 Del. C. § 2710 aims to protect an insured from being denied coverage for an omission or misstatement in an application that the he failed to review,[83] this concern does not control here because both parties clearly intended the CFS to be part of the Application.  Put another way, the attachment requirements do not operate to allow gross misrepresentations to be made during the application process.  Whether Rucker actually signed the CFS does not affect whether the parties objectively intended it to be incorporated into the Application.

2.     *Representations in the CFS*

As the existence and materiality of misrepresentations in the CFS are

---

[79] *Id.*
[80] D.I. 133 at 16; D.I. 140 at 6-7.
[81] D.I. 117, Halder Decl., Ex. U.
[82] *Id.*  The parties dispute whether Rucker actually signed the CFS.  D.I. 117, Gosselin Aff., Ex. A at 81-82 (noting that Rucker does not believe he signed CFS).
[83] *Brasure*, 37 F.Supp. 2d at 344.

undisputed,[84] the question is to which party they are attributable.  Insurance Trust

argues that Friedman was both the source of the misrepresentations and an agent of

Principal, leaving Principal responsible for the content of the CFS.[85]  Principal, on the

other hand, asserts that Rucker provided financial information to Aery, who

subsequently related different information to Friedman.[86]  Through this exchange,

Principal insists that the misrepresentations arose with Aery.[87]  In the alternative,

Principal contends it does not own these misrepresentations even if attributable to

Friedman, because he was either not Principal's agent or was acting outside the scope

of his authority and in his own self-interest in making them.[88]

Under Delaware law, an insurance agent is "a licensed producer of the

Department appointed by an insurer to sell, solicit or negotiate applications for policies

of insurance on its behalf and, if authorized to do so by the insurer, to issue conditional

receipts."[89]  An insurance broker, on the other hand, is "a licensed producer of the

Department who for compensation negotiates on behalf of others contracts for

insurance from companies to whom he or she is not appointed."[90]  Broker actions are

---

[84] D.I. 117 at 9; D.I. 133 at 4.  *See also* D.I. 117, Gosselin Aff., Ex. E; D.I. 117, Gosselin Aff., Ex. F.

[85] *See* D.I. 119 at 18, 20.  *See also* D.I. 134, James Decl. I, Ex. 17 (highlighting Aery's deposition statement that he did not provide false financial information).

[86] D.I. 140 at 8.

[87] D.I. 132 at 11-12 (urging that if Friedman completed the CFS, a factual issue exists as to whether Aery's statements are imputable to Rucker).  *See also* D.I. 134, James Decl. I, Ex. 18 (highlighting Friedman's deposition statement that he received financial information from Aery).

[88] D.I. 123 at 12-15.

[89] 18 Del. C. § 1702(b).

[90] 18 Del. C. § 1702(e).

not imputable to insurers.[91]  An insurer is liable, however, for actions performed in the course of an agent's employment and within the scope of his authority.[92]  Thus, a policy cannot be voided due to misrepresentations made by the insurer's own agent.[93]  Courts recognize an exception to this rule, however, when the interests of an agent and principal are adverse.[94]  Whether an individual is an agent of the insurer or a broker for the insured depends on the facts and must be evaluated in light of the statutory purpose of protecting the public.[95]

Genuine issues of material fact prevent summary judgment concerning the CFS. While it is clear from the record that Rucker provided Aery with information concerning his assets and income,[96] and that Aery in turn provided similar information to Friedman,[97] it is unclear whether the misrepresentations arose with Aery after speaking to Rucker or with Friedman after speaking to Aery.  This factual issue alone prohibits summary judgment.  But even if these misrepresentations plainly arose with Aery, factual questions would remain concerning whether Aery was acting as Rucker's agent

---

[91] *National Fire Ins. Co. of Hartford v. E. Shore Labs*, 301 A.2d 526, 530 (Del. Super. Ct. 1973) (explaining the difference between agents and brokers regarding imputable conduct).

[92] *In re Brandywine Volkswagen, Ltd.*, 306 A.2d 24, 27 (Del. Super. Ct. 1973).

[93] *Rust v. Metro. Life. Ins. Co.*, 172 A. 869, 871 (Del. Super. Ct. 1934).

[94] *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, No. Civ.A. 2129-VCN, 2007 WL 1498989, at *10 (Del. Ch. May 16, 2007) (citations omitted).  In the context of alleged STOLI transactions, this court has held that an agent making misrepresentations about the intent to transfer a policy is acting adversely to a principal and in his own self interest.  *See Penn Mut. Life Ins. Co. v. Norma Espinosa 2007-1 Ins. Trust*, C.A. No. 09-300-JJF, 2010 WL 3023402, at *4 (D. Del. July 30, 2010).

[95] *Allstate Auto Leasing Co. v. Caldwell*, 394 A.2d 748, 750-51 (Del. Super. Ct. 1978).

[96] D.I. 117, Gosselin Aff., Ex. A at 88.

[97] D.I. 120, Moore Decl., Ex. 36 at 99-100.

for purposes of completing the CFS.[98]  Similarly, if they arose with Friedman, factual

questions would remain as to whether Friedman was acting as Principal's agent in this

regard.[99]  Because the court cannot say that the misrepresentations in the CFS are

attributable to either party as a matter of law, summary judgment is denied on this issue.

     3.    *Representations in the Application*

     The parties differ as to whether Rucker answered Application questions 6(a) and

6(b) accurately, and if not, whether any misrepresentations were knowingly made.

     Concerning question 6(b), which dealt with the intent to "borrow money to pay the

premiums . . . or have someone else pay . . . in return for an assignment of policy

values," the answer was "no."[100]  Insurance Trust asserts that this response is accurate

because Rucker never assigned the Policy rights in exchange for premiums.[101]  While

the parties agree that money was borrowed to pay the premium payments, they dispute

whether borrowing such funds was *in exchange for* assignment of the Policy.[102]  This

unresolved issue of material fact precludes summary judgment on question 6(b).

---

   [98] At deposition, Rucker testified that Aery provided inaccurate and inflated financial information to Friedman and that he was unaware of Aery's alleged distortions at the time.  D.I. 117, Gosselin Aff., Ex. A at 88-89.

   [99] Principal appointed Friedman as its agent with the Delaware Insurance Department for a period beginning July 3, 2007 and ending January 22, 2008.  D.I. 134, James Decl., Ex. 3.  In his "Brokers Contract" with Principal, however, Friedman is referred to as "an independent contractor."  D.I. 132, Supp. Gosselin Aff., Ex. Z.  Even if Friedman were Principal's agent, there is insufficient evidence to determine as a matter of law whether he was acting outside the scope of his authority and/or in his own undivided self-interest in helping to procure the Policy.

   [100] D.I. 117, Halder Decl., Ex. T.

   [101] D.I. 133 at 22.

   [102] D.I. 117, Gosselin Aff., Ex. A at 145-46 (discussing Rucker's belief that Aery would pay premium payments during the transaction); D.I. 117, Gosselin Aff., Ex. D at 174 (showing Aery's belief that Rucker borrowed premium payments because he was not "liquid").

18

Insurance Trust's argument that question 6(a) was answered accurately is less persuasive.  Question 6(a) asks:  "[i]s there an intention that any group of investors will obtain any right, title, or interest in any policy issued on the life of the Proposed Insured(s) as a result of this application?"[103]  The answer was "no."[104]  Insurance Trust insists that this response is valid because only a beneficial interest in the Policy proceeds was sold, not the Policy itself.[105]  The court cannot credit this argument. Question 6(a) unambiguously asks whether *any* group of investors will obtain *any* interest in the Policy.  The purchaser of a beneficial interest in the proceeds of a life insurance policy certainly has *an interest* in that policy, even though the purchaser may not become the policy's named beneficiary or have any legal rights against the insurer. The response to question 6(a) therefore misrepresented Rucker's intent at the time the Policy was issued.

Despite this finding, a genuine issue of fact remains concerning whether Rucker made this misrepresentation knowingly.  The Application required Rucker to certify that all statements were "true and complete to the best of [his] knowledge."[106]  In the context of insurance applications, "this language has the effect of shifting the focus . . . from an inquiry into whether the facts asserted were true *to whether, on the basis of what he knew, the applicant believed them to be true.*"[107]  Principal argues Rucker's testimony

---

[103] D.I. 117, Halder Decl., Ex. T at 2.
[104] *Id.*
[105] D.I. 133 at 22.
[106] D.I. 117, Halder Decl., Ex. T at 8.
[107] *Dickson-Witmer v. Union Bankers Ins. Co.*, Civ. A. No. 92C-07-107, 1994 WL 164554, at *4 (Del. Super. Ct. Apr. 27, 1994) (citing *Skinner v. Aetna Life and Cas.*, 804 F.2d 148, 150 (D.C. Cir. 1986)) (emphasis in original).

that he had "no intent to keep that policy"[108] demonstrates that he knew the response to question 6(a) to be false when it was made.[109]  Insurance Trust, however, points to other portions of Rucker's deposition stating that he never discussed the meaning of question 6(a) with Aery when the Application was completed, and that Aery simply told him to answer in the negative.[110]  Rucker further testified that he intended to and did provide accurate information to Principal.[111]

"While it is no doubt true that an insured may not rely upon an interpretation placed upon a policy by an agent which is patently absurd, an insured may rely upon an interpretation which is plausible, although legally untenable, provided that the interpretation be not 'in patent conflict' with the terms of the policy."[112]  Though the court finds Aery's purported interpretation of question 6(a) to be legally untenable in this case, it does not find this interpretation "patently absurd" in the sense that a layperson such as Rucker should have been expected to see through it.[113]  This genuine dispute over whether Rucker appreciated the import of Application question 6(a) at the time it was answered renders summary judgment on that question inappropriate.

---

[108] D.I. 117, Gosselin Aff., Ex. A at 59.

[109] D.I. 132 at 16.

[110] D.I. 117, Gosselin Aff., Ex. A at 144:7-145:19.

[111] *Id.* at 148.  The parties do not dispute Rucker's testimony in this regard.

[112] *Mut. Benefit Life Ins. Co. v. Bailey*, 190 A.2d 757, 760 (Del. 1963) (quoting *Stivers v. Nat'l Am. Ins. Co.*, 247 F.2d 921, 928 (9th Cir. 1957)).

[113] Insurance Trust cites a recent Opinion Letter from the New York Insurance Department recognizing a distinction between transfer of the beneficial interest in a trust that owns a life insurance policy and transfer of the policy itself.  *See* Selling and Assigning a Beneficial Interest in a Trust that Owns Life Insurance Policies, OGC Op. No. 10-02-01 (N.Y. State Ins. Dept. Feb. 9, 2010).  While the Insurance Department's analysis in no way controls this court's interpretation of Application question 6(a), it is persuasive in demonstrating that other bodies have found Insurance Trust's argued-for distinction meaningful.

**V.  CONCLUSION**

For the reasons above, Principal's motion for summary judgment is granted as to Count I of the Second Amended Complaint and otherwise denied.  Insurance Trust's motion for summary judgment is denied in its entirety.