## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRINCIPAL LIFE INSURANCE COMPANY, | : : | |
| | : | |
| Plaintiff, | : : | |
| v. | : : | C. A. No. 08-488-MPT |
| | : : | |
| LAWRENCE RUCKER 2007 INSURANCE TRUST, | : : | |
| | : : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Karen V. Sullivan, Drinker Biddle & Reath LLP, 1100 North Market Street, Suite 1000, Wilmington, DE 19801.

 Of Counsel: Jason P. Gosselin and Thomas J. Downie, Drinker Biddle & Reath, One Logan Square, Suite 2000, Philadelphia, PA 19103.
Counsel for Plaintiff, Principal Life Insurance Company.

John E. James, David E. Moore and Michael B. Rush, Potter Anderson & Corroon LLP, 1313 North Market Street, Hercules Plaza, 6th Floor, P.O. Box 951, Wilmington, DE 19899.

 Of Counsel: John E. Failla, Elise A. Yablonski and Nathan Lander, Proskauer Rose LLP, 11 Times Square, New York, NY 10036.
Counsel for Defendant, Lawrence Rucker 2007 Insurance Trust.

Wilmington, Delaware
June 26, 2012

THYNGE, MAGISTRATE JUDGE

## I. INTRODUCTION

On August 8, 2008, plaintiff Principal Life Insurance Company ("Principal")
instituted this action seeking declaratory relief and damages against Christiana Bank
and Trust Company ("Christiana Bank"), as trustee for the Lawrence Rucker 2007
Insurance Trust ("Insurance Trust").[1]  On September 17, 2008, the parties entered a
stipulation substituting Insurance Trust as defendant in lieu of Christiana Bank.[2]
Principal subsequently amended its complaint and sought a judgment that the Rucker
life insurance policy ("Policy")  was void due to material misrepresentations in the
application for insurance and to recover damages for fraud.[3]  Principal claimed the
Policy issued on the life of Lawrence Rucker ("Rucker") was void because of a lack of
an insurable interest and/or material misrepresentations.[4]

On August 30, 2010, this court found in favor of Principal on the insurable
interest claim and declared the Policy void for lack of insurable interest under 18 *Del. C.*
§ 2704.[5]  On September 20, 2011, the Delaware Supreme Court addressed the
question of insurable interest in the pending cases in this court of *PHL Variable Ins. Co.
v. Price Dawe 2006 Ins. Trust* and *Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006*

---

[1] D.I. 1 at 1.

[2] D.I. 8.

[3] D.I. 9; D.I. 44 at 1.  Principal filed two amended complaints.  The first amended
complaint was filed on September 17, 2008 and the second amended complaint was
filed on April 24, 2009.

[4] D.I. 44 at 1.

[5] *See Principal Life Ins. Co. v. Lawrence Rucker 2007 Insurance Trust*, 735 F.
Supp. 2d 130, 140 (D. Del. 2010) (holding Policy lacked insurable interest at inception
and was void).

*Ins. Trust.*[6]  In *Price Dawe*, the Delaware Supreme Court decided certified questions

from the United States District Court for the District of Delaware concerning the

insurable interest requirement under 18 *Del. C.* § 2704.[7]  Following the *Price Dawe*

decision, this court invited the parties to supplement their summary judgment briefing to

address the impact of *Price Dawe* on its August 30, 2010 decision.[8]  Presently before

the court is Principal's motion for summary judgment.[9]  For the reasons that follow, the

court denies Principal's motion for summary judgment.

## II. BACKGROUND

### A. Factual Background

This is a federal diversity action applying Delaware law.  Principal is a life

insurance company with its principal place of business in Des Moines, Iowa.[10]

Insurance Trust is a statutory trust pursuant to 12 *Del. C.* § 3801.[11]  Principal alleges

the Policy was procured as part of a stranger originated life insurance ("STOLI")

scheme.[12]  Principal claims the Insurance Trust was used to transfer the Policy on the

secondary market and circumvent insurable interest requirements.[13]

Rucker began the process of obtaining life insurance through interactions with

---

[6] *See PHL Variable Ins. Co. v. Price Dawe 2006 Insurance Trust,* 28 A.3d 1059, 1063 (noting cases involved whether life insurance policies lacked an insurable interest).

[7] *Id.* (describing referral of certified questions from the United States District Court for the District of Delaware).

[8] D.I. 201; D.I. 217.

[9] D.I. 116; D.I. 201.

[10] D.I. 44 at 1.

[11] *Id.*; D.I. 57 at 1.

[12] D.I. 201 at 1.

[13] *Id.*

Wayne Aery ("Aery").[14] Aery worked with Brad Friedman ("Friedman"), a purported

agent of Principal.[15] Aery and Friedman also did business under the brokerage firm

Lextor Financial.[16] Aery assisted Rucker in completing the application ("Application") for

life insurance.[17] The Application required disclosures as to whether "any group of

investors will obtain any right, title, or interest in any policy issued on the life of the

Proposed Insured(s)" and whether the applicant would "borrow money to pay the

premiums for this policy or have someone else pay the premiums . . . in return for an

assignment of policy values back to them."[18] Both questions were answered in the

negative.[19] The validity of those answers is disputed.[20]

In addition to the Application, Rucker also submitted a Confidential Financial

Statement ("CFS").[21] The CFS represented Rucker's yearly income at $425,000 and

_____

[14] *Compare* D.I. 201 at 5 (stating Rucker was approached by Aery about taking out a life insurance policy), *with* D.I. 217 at 4 (stating Rucker approached Aery and inquired about taking out a life insurance policy).

[15] D.I. 217 at 4 (stating Aery and Friedman did work for Lextor Financial).

[16] D.I. 202, Jason P. Gosselin ("Gosselin") Aff. (Counsel for Principal, affidavit in support of Principal's motion), Ex. D at 15:18-16:4 (explaining Lextor Financial is Friedman's corporation and Aery is an independent contractor of Lextor).

[17] D.I. 201 at 7.

[18] D.I. 204, Neal P. Halder ("Halder") Decl. (Assistant Vice President and Chief Underwriter for Principal, discussing the Application which Principal relied on in issuing the Policy) at ¶¶ 9-10; Ex. T.

[19] *Id.*

[20] *Compare* D.I. 201 at 7-8 (stating Principal's belief the answer to Question 6(a) is false because Rucker always intended to sell the Policy) *and id.* at 9 (noting Principal's belief the answer to Question 6(b) is false because Rucker did not, and could not, pay premiums), *with* D.I. 133 at 22 (indicating Insurance Trust's belief the answer to Question 6(a) is true because Insurance Trust is still owner of the Policy) *and id.* at 21 (explaining Insurance Trust's belief the answer to Question 6(b) is true because Rucker never assigned Policy in exchange for premiums).

[21] D.I. 201 at 7.

4

his net worth at \$4.85 million.[22]  Rucker's actual income was approximately \$120,000 and his net worth significantly less than represented.[23]  Though the origin of this false information is unclear, the parties agree it is invalid and not directly attributable to Rucker.[24]

Prior to submitting the Application to Principal, multiple trusts were created.  On or about August 14, 2007, the Lawrence Rucker 2007 Family Trust ("Family Trust") was established.[25]  The Family Trust listed Rucker as settlor, Christiana Bank as trustee, and Rucker as beneficiary.[26]  Additionally, on or about August 15, 2007, the Insurance Trust was established.[27]  The Insurance Trust agreement listed Rucker as settlor, Christiana Bank as trustee, and the Family Trust as beneficiary.[28]  The Insurance Trust agreement was generated by Park Venture.[29]  Park Venture is a company that prepares trust documents.  Rucker also selected his friend Morris Tepper ("Tepper") to serve as the trust protector and act on his behalf.[30]  Rucker, Tepper and Christiana signed and accepted the Insurance Trust agreement.[31]  The Insurance Trust was funded with the Policy, but Principal and Insurance Trust dispute whether the Insurance Trust could

_____

[22] D.I. 202, Gosselin Aff., Ex. A. at 88:1-89:12.

[23] *Id.*

[24] *Compare* D.I. 133 at 7 (stating information in CFS was not provided by Rucker), *with* D.I. 117 at 10 (noting Rucker was not aware of false information in CFS).

[25] D.I. 201 at 10; D.I. 202, Gosselin Aff., Ex. G.

[26] *Id.*; D.I. 217 at 5-7.

[27] D.I. 201 at 10.

[28] *Id.*

[29] D.I. 201 at 10-11; D.I. 217 at 29.

[30] D.I. 220, Cedric Strother ("Strother") Aff. (Trust officer of Wilmington Savings Fund Society, successor to Christiana Bank & Trust Company, describing Christiana's role as trustee of the Insurance Trust and the Family Trust), Ex. 1 at 12, Article IX.

[31] D.I. 217 at 7.

properly fund the Policy.[32]  Insurance Trust maintains Rucker initially funded the

Insurance Trust with a $100 payment from his own funds.[33]

During this period GIII was formed.[34]  GIII is a Delaware statutory trust in the

business of purchasing beneficial interests in insurance trusts.[35]  GIII works with Joseph

Capital LLC ("Joseph Capital"), a broker-dealer that locates insureds who are interested

in selling their trust interests to buyers.[36]  Principal and the Insurance Trust dispute

whether Park Venture produced the trust agreement for the Insurance Trust at the GIII

Accumulation Trust's ("GIII") instruction.[37]

On September 26, 2007, Principal issued a Flexible Premium Universal Life

Insurance Policy in the amount of $3.5 million.[38]  The Policy named Insurance Trust as

the beneficiary.[39]  Rucker could not afford the premium on the Policy.[40]  Aery provided

Rucker with $79,748.77, which Rucker used to write a check to Principal for the

premium payment.[41]

_____

[32] *Compare* D.I. 239 at 10 (explaining Aery provided the money for the premium payment to Rucker and Rucker did not pay the premium with his own money, preventing him from funding the trust with the Policy), *with* D.I. 217 at 28 (describing Rucker as both placing the Policy in the trust and paying the premiums for the Policy by acquiring a loan from Aery).

[33] D.I. 217 at 28-30; D.I. 220, Strother Aff. Ex. 2.

[34] D.I. 220, Strother Aff., Ex. 12 at 14, Article VI.

[35] D.I. 217 at 9; D.I. 219, Jose I. Mercado ("Mercado") Aff. (Vice President of Wells Fargo Delaware Trust Company, trustee of GIII Accumulation Trust, affidavit in opposition to Principal's motion) at ¶ 3.

[36] *Id.*

[37] *Id.*; D.I. 203, Thomas S. Downie ("Downie") Aff. (Counsel for Principal, affidavit in support of Principal's motion), Ex. A at 103:7-104:7.

[38] D.I. 201 at 13.

[39] *Id.*

[40] D.I. 202, Gosselin Aff., Ex. A at 60:1-4.

[41] *Id.*

GIII was advised by Grant Heller ("Heller"), a representative of Joseph Capital, that Rucker wished to sell the beneficial interest in the Insurance Trust.[42]  On October 26, 2007, a purchase agreement for the beneficial interest in the Insurance Trust was executed between the Family Trust and GIII.[43]  The Family Trust was later terminated, making GIII the sole beneficiary of the Insurance Trust.[44]  Although the Insurance Trust remains the named beneficiary of the Policy, GIII is the actual beneficiary, pursuant to the purchase agreement, and will receive all Policy proceeds in the event they are distributed.  After selling the beneficial interest in the Insurance Trust to GIII, Rucker repaid the money Aery provided him for the premium payment.[45]

## B. Procedural Background

On August 30, 2010, without the guidance of Delaware case law on this specific issue, the court found the Policy void for lack of an insurable interest as a STOLI scheme, and granted judgment in favor of Principal on its lack of insurable interest claim.[46]

On September 20, 2011, the Delaware Supreme Court answered three certified questions propounded by the court in the pending cases of *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust* and *Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006*

---

[42] D.I. 221, Heller Aff. (held positions in Park Venture Advisors and Radian Funding LLC during Rucker's application process for the Policy, affidavit in opposition to Principal's motion) at ¶¶ 9-11, 17.

[43] D.I. 219, Mercado Aff., Ex. 4.

[44] *Id.*

[45] D.I. 202, Gosselin Aff., Ex. J.

[46] *See Principal Life Ins. Co. v. Lawrence Rucker 2007 Insurance Trust*, 735 F. Supp. 2d 130, 140 (D. Del. 2010) (holding Policy lacked insurable interest at inception and was void).

*Ins. Trust.*[47]  Both cases involved actions by life insurers seeking to have the life

insurance polices they issued to trusts declared void based on lack of insurable

interest.[48]  The cases also included an investor's purchase of the trusts' beneficial

interests shortly after issuance of the life insurance policies.[49]

The first certified question presented to the Delaware Supreme Court concerned

the interpretation of Delaware's incontestability statute.[50]  This question does not bear

on this case because Principal filed this action within the contestability period.[51]  The

second certified question addressed whether Delaware's insurable interest statute, 18

*Del. C.* § 2704 prohibited an insured from procuring a policy with the intention of

immediately transferring it to a person who does not have an insurable interest in the

insured's life.[52]  The third certified question addressed the trust's interest in the

insured's policy, specifically, whether a trustee has an insurable interest, if the insured

intends to transfer the beneficial interest of the trust to a third-party having no insurable

interest in the insured's life.[53]

---

[47] *See PHL Variable Life Ins. Co. v. Price Dawe 2006 Insurance Trust*, 28 A.3d 1059, 1063 (Del. 2011) (noting cases involved whether life insurance policies lacked an insurable interest).

[48] *Id.*

[49] *Id.* at 1063-64.

[50] *Id.* at 1064-65.

[51] D.I. 194 at 1.

[52] *See Price Dawe*, 28 A.3d at 1068 (asking "Does 18 *Del. C.* § 2704(a) and (c)(5) prohibit an insured from procuring or effecting a policy on his or her own life and immediately transferring the policy, or a beneficial interest in a trust that owns and is the beneficiary of the policy, to a person without an insurable interest in the insured's life, if the insured did not ever intend to provide insurance protection for a person with an insurable interest in his or her own life?").

[53] *See id.* at 1076 ("Does 18 *Del. C.* § 2704(a) and (c)(5) confer upon the trustee of a Delaware trust established by an individual insured an insurable interest in the life of that individual when, at the time of the application for life insurance, the insured

8

In answering the second question, the court found the intent of the insured to immediately transfer a life insurance policy to a person without an insurable interest was not a violation of insurable interest.[54]  However, the insured must have procured or effected the policy and the policy cannot be a mere cover for wager.[55]  A third party cannot use the insured as a conduit to procure a policy it otherwise could not obtain due to lack of an insurable interest.[56]  Under *Price Dawe*, whether the third party procured the policy through the insured is determined by identifying which party paid the insurance premiums.[57]  If the insured was responsible for paying the premiums, then the policy is valid and freely transferrable by the insured.[58]  Thus, the insured has a right to take out a policy with the intent to immediately transfer the policy, but "that right is limited to bona fide sales of that policy taken out in good faith."[59]

With respect to the third question, the court held a trustee would have an insurable interest, regardless of whether the trust beneficiaries had planned to sell their beneficial interests in the trust to an investor, as long as the individual insured actually established and provided the corpus for the trust.[60]  This requirement is not satisfied if

_____

intends that the beneficial interest in the Delaware trust would be transferred to a third party investor with no insurable interest in that individual's life following issuance of the life insurance policy?").

[54] *Id.* at 1068.

[55] *Id.*

[56] *Id.* at 1074.

[57] *Id.* at 1075-76 (explaining "life insurance policies . . . do not come into effect without premiums, so an insured cannot 'procure or effect' a policy without actually paying the premiums").

[58] *Id.*

[59] *Id.* at 1075.

[60] *Id.* at 1076.

the trust is created through nominal funding as a mere formality.[61] Additionally, if the funding is provided by a third party as part of a pre-negotiated agreement, then the substantive requirements of 18 *Del. C.* § 2704 are not met.[62] Therefore, if the life insurance is procured for a legal purpose and not as a cover for wager, the trustee would have an insurable interest.[63] But, in cases where a third party either directly or indirectly funds the premium payments as part of a pre-negotiated arrangement with the insured to immediately transfer ownership, the policy fails at its inception for lack of an insurable interest.[64]

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is granted only when the record demonstrates that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. In deciding a motion for summary judgment, a court's role is not to weigh the evidence or to determine the truth of the matters asserted, but to determine whether there is a genuine issue of fact for trial.[65] In so doing, the court must view all facts and draw all reasonable inferences in favor of the non-movant, take as true all allegations of the non-movant that conflict with those of the movant, and resolve all doubts against the movant.[66] The court also must treat direct and circumstantial evidence alike.[67]

―――――――――――――――

[61] *Id.* at 1078.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[66] *United States v. Diebold, Inc.* 369 U.S. 654, 655 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

[67] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003).

## Delaware Insurable Interest Statute

The Delaware Insurable Interest statute, 18 *Del. C.* § 2704(a) and (c)(5) provides, in pertinent part:

(a) Any individual of competent legal capacity may procure or effect an insurance contract upon his/her own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his/her representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.

(c)(5) The trustee of a trust created and initially funded by an individual has an insurable interest in the life of that individual and the same insurable interest in the life of any other individual as does any person who is treated as the owner of such trust for federal income tax purposes without regard to:

a. The identity of the trust beneficiaries;

b. Whether the identity of the trust beneficiaries changes from time to time; and

c. The means by which any trust beneficiary acquires a beneficial interest in the trust.

The trustee of a trust has the same insurable interest in the life of any individual as does any person with respect to proceeds of insurance on the life of such individual (or any portion of such proceeds) that are allocable to such person's interest in such trust.  If multiple beneficiaries of a trust have an insurable interest in the life of the same individual, the trustee of such trust has the same aggregate insurable interest in such life as such beneficiaries with respect to proceeds of insurance on the life of such individual (or any portion of such proceeds) that are allocable in the aggregate to such beneficiaries' interest in the trust.

## IV. DISCUSSION

### A. Intent to Transfer

The Delaware Supreme Court held an insured was not prohibited from

11

transferring a life insurance policy to a person without an insurable interest.[68] The court, however, limited this right to circumstances where the insured procured or effected the policy and the policy was not a mere cover for wager.[69] In determining whether an insured or another person without an insurable interest, procured a policy the court focused on who paid the insurance premiums.[70]

### 1. Whether the Insured Procured and Effected the Policy

Although the *Price Dawe* decision permits an insured to obtain a policy and designate someone without an insurable interest as its beneficiary, Principal argues the Rucker Policy is void because it was not acquired in good faith and is, in effect, "a wager on human life."[71] Insurance Trust counters Rucker procured the Policy and Principal has not demonstrated GIII used Rucker as a means to secure the Policy.[72]

The Delaware Supreme Court found payment of the premiums by the insured was a key fact supporting the insured procured the policy.[73] Here, Rucker paid the premiums with money he received from Aery.[74] Principal characterizes Aery's provision of money to Rucker as a financial inducement to Rucker and points to the intent of Rucker to resell the Policy as evidence of a wagering contract.[75] Insurance Trust maintains Rucker obtained the Policy and paid the premiums by receiving a loan from

---

[68] *Price Dawe*, 28 A.3d at 1068.
[69] *Id.*
[70] *Id.* at 1075-76.
[71] D.I. 201 at 3-4.
[72] D.I. 217 at 14.
[73] *Price Dawe,* 28 A.3d at 1068.
[74] D.I. 202, Gosselin Aff., Ex. A at 60:19-62:4.
[75] D.I. 201 at 16-17.

12

Aery.[76]  Insurance Trust also describes Rucker as initially expressing interest in premium financing.[77]  Premium financing allows an insured to obtain money from a bank to pay premiums on a policy which he intends to sell at a later date.[78]  Insurance Trust argues premium financing and the payment of premiums through loans is a common occurrence and part of a regulated industry in Delaware.[79]  Additionally, insurance companies and agents are expressly permitted to loan premium funds to insureds.[80]

Although there was no official loan agreement between Rucker and Aery, *Price Dawe* does not foreclose an insured from borrowing money to pay for premiums.  An insured's ability to procure a policy is not limited to paying the premiums with his own funds; borrowing money with an obligation to repay would also qualify as an insured procuring a policy.  Additionally, both Rucker and Aery acknowledge an agreement between them that Aery would provide the money for the premium and Rucker would repay it.[81]

Principal urges the court to "scrutinize the circumstances under which the policy was issued and determine who in fact procured or effected the policy."[82]  Principal

———————————————————

[76] D.I. 217 at 22-23.

[77] *Id.* at 4; D.I. 224, John E. James ("James") Aff. (Counsel for Insurance Trust, affidavit in opposition to Principal's motion), Ex. 2 at 17:4-19:9.

[78] *Id.*

[79] D.I. 217 at 22; D.I. 218, William D. Hager ("Hager") Aff. (expert witness for Insurance Trust, affidavit in opposition to Principal's motion) at ¶¶ 13-16; 18 *Del. C.* §§ 4801-4812.

[80] D.I. 217 at 22; 18 *Del. C.* § 4812.

[81] D.I. 202, Gosselin Aff. *Ex.* A at 60:19-62:4; 100:12-105:7; D.I. 224 James Aff., Ex. 1 at 159;1-12; Ex. 2 at 175).

[82] *Price Dawe*, 28 A.3d at 1076.

alleges a third-party investor participated prior to the issuance of the Policy and provided the funding to Rucker to pay the premiums.[83]  To support this claim, Principal points to the false information provided on the CFS and the Application, Rucker's statement that he did not need life insurance and his intention to sell the Policy after acquiring it.[84]  That Aery provided money to Rucker to pay the premiums is undisputed, but there is not unrefuted evidence GIII, or any third-party investor, was the source of the money Aery gave to Rucker.[85]  Additionally, Aery testified no third party requested for him to provide the loan, nor did he advise anyone besides Rucker that he provided the loan.[86]  Aery also testified he obtained the loan for the initial premium from a commission he had made on the sale of a prior insurance policy.[87]  Finally, GIII testified at the time it purchased the beneficial interest in the trust, both Rucker and Friedman represented Rucker had paid the premium himself, and not with money from Aery.[88]

Unlike *Price Dawe*, where the investor paid the premiums, and the court considered this fact as substantial evidence of a lack of insurable interest, Aery testified he provided funds to Rucker for the premium.[89]  In short, a reasonable jury could find Rucker procured the Policy himself and paid the premium by obtaining a loan from Aery.  Absent evidence of third-party investors or Aery acting on their behalf funding the

---

[83] D.I. 201 at 4-5.

[84] *Id.* at 5-9.

[85] D.I. 219, Mercado Aff. at ¶¶ 5, 13-21.

[86] D.I. 224, James Aff., Ex. 2 at 167:20-175:12.

[87] *Id.*

[88] D.I. 219, Mercado Aff. at ¶¶ 20-21.

[89] *Compare Price Dawe*, 28 A.3d at 1076 (finding investor's payment of premiums was a key fact supporting lack of insurable interest), *with* D.I. 202, Gosselin Aff., Ex. D at 17:17-20:9 (where Aery describes loaning the money for the premiums to Rucker).

premium payment by Rucker, there is a genuine issue of material fact as to whether Rucker procured the Policy himself.

## 2. Whether the Policy Was a Mere Cover for Wager

In *Price Dawe*, the court emphasized "if a third party financially induces the insured to procure a life insurance contract with the intent to immediately transfer the policy to a third party, the contract lacks an insurable interest."[90] The Delaware Supreme Court identified payment of premiums as the primary means for determining whether the insured was used as a means to procure a life insurance policy.[91] While a policyholder's intent to transfer the beneficial interest to a trust who will then own and become the beneficiary of a life insurance policy is not inconsistent with 18 *Del. C.* § 2704, to demonstrate a STOLI scheme, the court still must determine whether a third party with no insurable interest in the life of the insured used the insured as an "instrumentality" to obtain the policy.[92] The right to transfer a policy is thus not unlimited; it requires a bona fide sale of the policy acquired in good faith.[93]

Principal argues even if a dispute exists as to whether Rucker procured the Policy through a loan from Aery, there is no insurable interest because the Policy was not secured in good faith.[94] Principal alleges Rucker was, in essence, a mere conduit for investors who would fund the Policy, and, thereby wager on Rucker's life. To demonstrate how GIII used Rucker as a conduit to procure the Policy, Principal relies

---

[90] *Price Dawe*, 28 A.3d at 1075.
[91] *Id.* at 1075-77.
[92] *Id.*
[93] *Id.* at 1075.
[94] D.I. 239 at 3.

15

on the facts surrounding the acquisition of the Policy and the formation of the trusts.[95]

Aery's loan to Rucker for the premiums, the misrepresentation on the Policy Application, and Rucker's complete lack of knowledge about the trusts, their formation and purpose call into question the acquisition and subsequent sale of the Policy. However, these facts do not adequately demonstrate third-party investors used Rucker as an instrumentality to obtain the Policy. GIII paying the premiums or loaning money to either Rucker or Aery to cover the premiums, would be clear evidence of an agreement for Rucker to later sell the Policy to GIII.

To support that Rucker was a mere instrumentality, Principal relies heavily on Rucker's consistent testimony that he always intended to sell the Policy.[96] However, *Price Dawe* noted the intent of the policyholder alone to immediately transfer a newly purchased life insurance policy to be insufficient to create a STOLI scheme under Delaware law.[97] For a policy to constitute a wager voiding any insurable interest, both an intent to immediately transfer the policy to a third party *and* a financial inducement by a third party to procure a life insurance contract on the insured are required. Rucker's testimony demonstrates a clear and pre-existing intent to transfer the Policy when it was issued, but there is less support for a financial inducement to Rucker. Here, GIII denies any arrangement with Rucker, Friedman or Aery that GIII would

---

[95] *See generally id.*

[96] D.I. 202, Gosselin Aff., Ex. A at 59:4-11.

[97] *Price Dawe*, 28 A.3d at 1074 ("The insurable interest requirement does not place any restrictions on the subsequent sale or transfer of a bona fide life insurance policy . . . a life insurance policy that is validly issued is assignable to anyone, with or without an insurable interest, at any time. The key distinction is that a third party cannot use the insured as a means or instrumentality to procure a policy that, when issued, would otherwise lack an insurable interest.").

purchase the Policy.[98] In addition, affidavits from Strother, Friedman, Mercado and Heller indicate Christiana Bank, Park Venture and Joseph Capital were not part of an arrangement to fund the premium payments or purchase the Policy.[99] Thus, the facts and circumstances provided by Principal to support the contention Rucker was used as a means to procure a policy are all disputed by testimony from various witnesses. Once again, there are genuine issues of material fact as to whether Rucker was financially induced to procure the Policy, which prevents a conclusion that Rucker was a mere instrumentality, and the Policy operated as a wagering contract.

## B. The Trust's Interest

In situations involving a trust as the owner of the life insurance policy, *Price Dawe* instructs the court to assess whether the trust was actually created and funded by the insured, as opposed to the trust being established to effect a wager.[100] There the court held a trust has the same insurable interest as the insured, provided the insured funded his or her own trust to purchase the policy.[101] The court concluded whether the trust's beneficiaries intended to sell their beneficial interests in the trust to an investor was irrelevant to the insurable interest analysis.[102] However, if the trust

---

[98] D.I. 219, Mercado Aff. at ¶¶ 5, 12-19; D.I. 223, Friedman Aff. (Writing agent for the policy issued by Principal to Insurance Trust, affidavit in opposition to Principal's motion) at ¶¶ 6-13; D.I. 224, James Aff., Ex. 4 at 142:11-21; Ex. 5 at 176:2-177:3.

[99] D.I. 219, Mercado Aff. at ¶¶ 5, 12-19; D.I. 220, Strother Aff. at ¶¶ 13, 18-28; D.I. 221, Heller Aff. at ¶¶ 6, 14, 18, 21, 27-29; D.I. 223, Friedman Aff. at ¶¶ 6-13.

[100] *Price Dawe*, 28 A.3d at 1076.

[101] *Id.*

[102] *Id.* at 1077 (18 *Del. C.* § 2704(c)(5) provides a trustee has an insurable interest "without regard to the identity of the trust beneficiaries, whether the trust beneficiaries would change and the means by which any trust beneficiary acquires a beneficial interest in the trust").

were funded by a third party as part of a pre-negotiated agreement, then the insurable interest requirement would not be met.[103]

## 1. Creating the Trust

Principal argues Rucker did not create the trust because the Insurance Trust applied for and became the owner of the Policy and the Policy was delivered to the Insurance Trust, not to Rucker.[104] In addition, Principal alleges the trust forms were required by GIII and prepared by an affiliate of GIII, Park Venture.[105] Principal also claims Christiana Bank and GIII affiliates communicated about Rucker's trust application and referenced GIII.[106] Insurance Trust maintains Rucker did create the Insurance Trust because he signed the trust agreement, where he was named as settlor.[107] Additionally, Rucker provided a $100 check from his own funds to serve as the initial corpus of the trust, selected Tepper to serve as trust protector and designated his family as the Insurance Trust's beneficiaries.[108]

Principal argues Insurance Trust was not created by Rucker, but for the benefit of GIII. Principal points to testimony from Frank Sarropochiello ("Sarropochiello") that he heard the phrase GIII used to describe Park Venture's work in processing trusts.[109] However, Sarropochiello also indicated he was not familiar with GIII, never processed

_____

[103] *Id.* at 1078.
[104] D.I. 239 at 9.
[105] *Id.*
[106] *Id.*
[107] D.I. 217 at 27-30.
[108] *Id.* at 28.

[109] D.I. 201 at 11; D.I. 203 Downie Aff., Ex. A at 49:3-11; D.I. 222, Sarrapochiello Aff. (held positions in Horizon Life Solutions, Inc. and Park Venture during Rucker's application process for the Policy, affidavit in opposition to Principal's motion) at ¶ 8.

trusts at the request of GIII, nor supervised the sale of beneficial interests to GIII.[110] Similarly, Insurance Trust disputes the inference that GIII affiliates prepared the trust forms for Rucker, arguing companies like Park Venture are commonly sought to assist clients in forming trusts.[111] Moreover, Insurance Trust relies on testimony from GIII that it never created, funded or knew of an agreement to fund the Rucker Trust in order to purchase its beneficial interest.[112]

Rucker's testimony indicates he did not understand the role of the trusts, or why he needed to obtain them, which clearly undercuts the contention Rucker created the trusts.[113] However, Insurance Trust points to Rucker's execution of the trust agreement, and his selection of beneficiaries and Tepper as trust protector, as facts which illustrate Rucker met the technical requirements for creating a trust.[114] In sum, whether the trusts were established by GIII and for its sole benefit, as well as who actually established the Insurance Trust raises a genuine issue of material fact about which a reasonable jury could disagree.

## 2. Funding the Trust

In *Price Dawe*, the court explained "where the . . . insured creates a trust to hold a life insurance policy on his life and funds the trust with that policy or money to pay its premiums then the trustee has the same insurable interest that the settlor has in his own life."[115] Principal argues Rucker did not initially fund the Insurance Trust because

---

[110] D.I. 222, Sarrapochiello Aff. at ¶¶ 7-8.

[111] D.I. 217 at 29-30.

[112] *Id.* at 24-26.

[113] *See generally* D.I. 202, Gosselin Aff., Ex. A at 65:22-75:22.

[114] D.I. 217 at 28.

[115] *Price Dawe*, 28 A.3d at 1078.

19

the Insurance Trust was funded by the Policy, which was obtained through premium payments made through Aery, not Rucker's own funds.[116] Insurance Trust asserts Rucker funded the trust with an initial $100 check from his own money, as well as by putting the Policy in the Insurance Trust and by paying the premiums through a loan secured from Aery.[117]

Principal has not met its burden of proving Rucker did not initially fund the Insurance Trust. Insurance Trust has presented facts, including the initial $100 check from Rucker, which contradict Principal's position on the funding of the Insurance Trust.[118] Additionally, evidence has been proffered suggesting Rucker paid the premiums for the Policy through a loan from Aery.[119] Whether an insured procured a policy is not limited to paying premiums with his own funds; borrowing money with an obligation to repay also qualifies. As noted herein, a reasonable jury could find Rucker procured the Policy himself by paying the premium through a loan from Aery, which means Rucker provided the initial funding for the trust. Additionally, since Rucker designated the Insurance Trust as the owner and beneficiary of the Policy, by obtaining the Policy through a loan from Aery, he also funded the Insurance Trust with the Policy.[120]

*Price Dawe* stated the requirement to establish a trust "is not satisfied if the trust is created through nominal funding as a mere formality. If the funding is provided by a

---

[116] D.I. 239 at 10.

[117] D.I. 217 at 28-30.

[118] D.I. 224, James Aff., Ex. 2 at 69:20-70:25; D.I. 220, Strother Aff., Ex. 2.

[119] D.I. 217 at 7-8,12.

[120] *Id.*

third party as part of a pre-negotiated agreement, then the substantive requirements of sections 2704(a) and 2704(c)(5) are not met."[121]  Assuming the $100 check Rucker used to initially form the trust is an example of nominal funding, the Insurance Trust maintains that by putting the Policy in the Insurance Trust and agreeing to reimburse Aery on the loan for the premiums, Rucker's conduct satisfies the requirements in *Price Dawe* for funding a trust.[122]  Thus, there are disputed issues of material fact whether GIII or Rucker initially funded the Insurance Trust, which prevent granting judgment in favor of Principal.

Finally, despite whether Rucker did initially fund the trust, Principal is unable to demonstrate the funding provided to Rucker was part of a pre-negotiated agreement. GIII testified it did not create or initially fund the Insurance Trust, nor provide funding to Rucker prior to the Policy being issued, and had no agreement with Rucker to purchase the beneficial interest.[123]  Similarly, no unrefuted evidence of another third-party investor providing the funding to Rucker, the Insurance Trust or Aery has been presented.[124] Rather, the Insurance Trust points to testimony from Strother, Heller and Friedman that GIII, Christiana Bank, Park Venture and Joseph Capital did not provide funding to Rucker or have a prearrangement to buy the beneficial interest in the Insurance Trust.[125]  Therefore, the evidence on which Principal relies is disputed by evidence

---

[121] *Price Dawe*, 28 A.3d at 1078.

[122] D.I. 217 at 28-30.

[123] D.I. 219, Mercado Aff. at ¶¶ 5, 12-19.

[124] D.I. 217 at 29.

[125] D.I. 220, Strother Aff. ¶¶ 13, 18-28; D.I. 221, Heller Aff. at ¶¶ 6, 14, 18, 21, 27-29; D.I. 223, Friedman Aff. at ¶¶ 6-13; D.I. 224, James Aff., Ex. 4 at 142:11-21; Ex. 5 at 176:2-177:3.

offered by Insurance Trust, thereby creating genuine issues of material fact whether Rucker procured the Policy, and created and funded the trust, as well as whether GIII had a prior agreement with Rucker to immediately obtain ownership of the Policy or the beneficial interest in the Insurance Trust.

## V. CONCLUSION

For the reasons herein, Principal's motion for summary judgment is denied as to Count I insurable interest of the Second Amended Complaint.